IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PATRICIA L. MALONE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-13-3043 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 9) and Defendant's Cross-Motion for Summary Judgment (Doc. 10). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

---

[1] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docs. 5, 6, 7.

A.  <u>**Medical History**</u>

Plaintiff was born on May 24, 1953, and was fifty-six years old on the date of the alleged onset of disability.[2]  Plaintiff attended one year of college and worked as an electrocardiogram ("EKG") technician until June 2009.[3]

Prior to Plaintiff's onset date, Plaintiff suffered a cerebral aneurysm in 1986, a right mastectomy in 1997, and a left mastectomy in 1999.[4]

On June 18, 2009, Plaintiff visited Memorial Hermann regarding swelling in her right upper arm.[5]  A physical examination found Plaintiff suffered from lymphedema related to her previous mastectomies.[6]  Plaintiff reported she smoked a quarter pack of cigarettes daily.[7]  A physical examination also found hypertension, joint stiffness, and arthritis, but was negative for other issues including anxiety and depression.[8]  The lymphedema was rated as Grade I using the Society of Lymphology's classification system, and Plaintiff rated her pain as a two on a ten-point scale.[9]  There

---

[2]     <u>See</u> Tr. of the Admin. Proceedings ("Tr.") 167.

[3]     <u>See</u> Tr. 140, 147.

[4]     <u>See</u> Tr. 211.

[5]     <u>See</u> <u>id.</u>

[6]     <u>See</u> Tr. 212.

[7]     <u>See</u> Tr. 211.

[8]     <u>See</u> Tr. 212.

[9]     <u>See</u> <u>id.</u>

was no sign of altered skin integrity.[10]  No edema was found in Plaintiff's right lower arm or right hand, as she was able to wear rings and other jewelry.[11]  Plaintiff admitted that she did not wear a compression sleeve although she had one.[12]  Plaintiff requested a Family Medical Leave Act ("FMLA") form to leave work indefinitely, but her request was denied.[13]  Plaintiff was scheduled for one week of physical therapy; additionally, Plaintiff was prescribed a new compression sleeve.[14]

On June 22, 2009, Plaintiff returned to Memorial Hermann, where she was fitted with compression bandages.[15]  Her lymphedema was rated as Grade II, and her pain was rated as a two on a ten-point scale.[16]  Plaintiff was instructed in general exercise techniques, including how to apply compression bandages, and was instructed to maintain good hydration and reduce salt intake.[17]

Plaintiff returned for treatment to Memorial Hermann on June 25, 26, 30, and July 1, 2009.[18]  On June 25, Plaintiff was given a

---

[10]   See id.

[11]   See Tr. 213.

[12]   See id.

[13]   See id.

[14]   See id.

[15]   See Tr. 249.

[16]   See Tr. 246.

[17]   See Tr. 249.

[18]   See Tr. 255-72.

new prescription for a compression sleeve and compression glove.[19]
The same day, Plaintiff was provided a letter of medical necessity
by Latisha Smith, M.D., regarding her compression sleeve.[20]  In all
of her visits, Plaintiff was described as alert and oriented to
time and place, and her pain was rated as a two on a ten-point
scale.[21]   Therapist notes indicated that Plaintiff's condition
showed improvement by her July 1 treatment.[22]

On October 9, 2009, Plaintiff was evaluated by Moe O. Zaw,
M.D., ("Dr. Zaw") on behalf of Disability Determination Services
("DDS").[23] Dr. Zaw noted that Plaintiff was able to squat and arise
from a squatting position, and was able to reach, handle, and
finger normally with each hand.[24]  Dr. Zaw rated Plaintiff's limb
strength as a five on a five-point scale for all limbs, although he
noted a slight strength decrease in Plaintiff's right hand.[25]  He
noted that Plaintiff was able to button clothes, pick up a pen, and
write.[26]  Dr. Zaw concluded that Plaintiff's neck and back pain
created no sensory, motor, or reflex abnormality, that her

---

[19]    See Tr. 256.

[20]    See Tr. 275.

[21]    See Tr. 255-72.

[22]    See Tr. 271.

[23]    See Tr. 320-24.

[24]    See Tr. 322.

[25]    See id.

[26]    See id.

hypertension did not cause any related organ disease, and that her lymphedema caused only mild weakness in her right hand grip.[27] Radiographs of Plaintiff's spine were evaluated by Jody Lee, M.D., who found that Plaintiff suffered from mild degenerative disc disease at the C5-6 and C6-7 vertebrae.[28]

On October 27, 2009, Kim Rowlands, M.D., ("Dr. Rowlands") completed a physical residual function capacity ("RFC") assessment.[29]  Dr. Rowlands found that Plaintiff was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and unlimited pushing or pulling.[30]  Dr. Rowlands opined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.[31]  She found that Plaintiff suffered from lymphedema and mild disc degeneration.[32]  Dr. Rowlands opined that Plaintiff's symptoms did not compromise her ability to perform all basic work activities, and stated that Plaintiff's alleged limitations were not fully supported by the medical record.[33]

---

[27] See Tr. 323.

[28] See Tr. 324.

[29] See Tr. 325-32.

[30] See Tr. 326.

[31] See Tr. 327-29.

[32] See Tr. 332.

[33] See id.

On November 3, 2009, Plaintiff visited Mark Blick, D.O., ("Dr. Blick") complaining of shoulder pain, lymphedema, hypertension, and a persistent cough.[34]  Dr. Blick completed an attending physician statement indicating that Plaintiff was permanently disabled due to lymphedema in her right arm.[35]  Dr. Blick indicated that he had been Plaintiff's physician since 2002, and saw Plaintiff every six months.[36]  Dr. Blick reported that Plaintiff had no ability to work, with no lifting, pushing, or pulling.[37]

On August 2, 2010, Plaintiff visited Denise Giuffrida, M.D., ("Dr. Giuffrida") complaining of migraine headaches and insomnia.[38]  Dr. Giuffrida provided a prescription for Midrin.[39]  On August 6, 2010, Plaintiff returned to Dr. Giuffrida's office in order to review lab results.[40]

On September 10, 2010, Plaintiff visited Dr. Giuffrida to discuss the results of a recent EKG.[41]  Dr. Giuffrida diagnosed Plaintiff with anemia and prescribed ferrous sulfate.[42]  Plaintiff's

---

[34]     See Tr. 449.

[35]     See Tr. 336-37.

[36]     See Tr. 336.

[37]     See Tr. 337.

[38]     See Tr. 457.

[39]     See id.

[40]     See Tr. 456.

[41]     See Tr. 455.

[42]     See id.

other diagnoses included migraines, eczema, insomnia, and hypertension.[43]   Dr. Giuffrida reported that Plaintiff was doing well, and re-filled prescriptions for Ambien and Midrin.[44]

On December 2, 2010, Plaintiff visited Houston Northwest Medical Center ("Northwest") for imaging of her spine.[45] Northwest's findings stated that Plaintiff showed mild end-plate sclerosis and marginal spurring on her C5-C6 vertebrae, and minimal marginal spurring with no spinal stenosis on her C6-C7 vertebrae.[46]

Also on December 2, 2010, Plaintiff had a three month check-up with Dr. Giuffrida.[47]   Dr. Giuffrida diagnosed Plaintiff with insomnia, neck pain, abnormal EKG, and anxiety.[48]   Dr. Giuffrida referred Plaintiff to a cardiologist.[49]

On December 7, 2010, Plaintiff was evaluated by John Farmer, M.D., ("Dr. Farmer") for a cardiology consultation.[50]   Dr. Farmer found that Plaintiff had intermittent shortness of breath and recommended an echocardiogram.[51]

---

[43]   See id.

[44]   See id.

[45]   See Tr. 433.

[46]   See id.

[47]   See Tr. 454.

[48]   See id.

[49]   See id.

[50]   See Tr. 439.

[51]   See Tr. 442.

On January 3, 2011, Plaintiff met with Dr. Giuffrida.[52]  Dr. Giuffrida noted that Plaintiff's x-rays indicated mild spinal stenosis.[53]  Plaintiff was advised to lose weight to better manage her hypertension.[54]

On February 24, 2011, Plaintiff visited Northwest.[55]  Images of her chest found no abnormalities, while images of her spine and hips found normal bone mass density.[56]

Plaintiff returned for follow-up appointments on February 1, 2011, and March 1, 2011 with Dr. Giuffrida.[57]  Plaintiff's March diagnoses included hyperlipedemia, anemia, and arthritis.[58]  Plaintiff was again advised to improve her exercise and diet.[59]

On June 1, 2011, Plaintiff visited Dr. Giuffrida for a follow-up visit.[60]  Plaintiff complained of hypertension, joint pain, anemia, hyperlipedemia, and weight gain.[61]      Plaintiff's

---

[52]   See Tr. 453.

[53]   See id.

[54]   See id.

[55]   See Tr. 426.

[56]   See Tr. 426-27.

[57]   See Tr. 451-52.

[58]   See Tr. 451.

[59]   See id.

[60]   See Tr. 450.

[61]   See id.

prescriptions were re-filled.[62]

On August 1, 2011, Plaintiff visited the office of Allen Chu, M.D., ("Dr. Chu") for treatment of migraine headaches.[63] Plaintiff graded her headaches as a nine on a ten-point scale, but denied all side effects, including pain in the eyes, ears, or teeth, light sensitivity, impaired vision, dizziness, or nausea.[64] Plaintiff reported incontinence, neck and arm pain, back and leg pain, headache, depression, and severe joint pain or arthritis.[65] Dr. Chu's evaluation found that Plaintiff was alert, had normal strength in her arms and legs, with normal coordination.[66]

On September 1, 2011, Plaintiff visited the Baylor College of Medicine ("Baylor"), where she was treated by Sharon Wen-Wen Chen, M.D. ("Dr. Chen").[67] Dr. Chen noted that Plaintiff reported recent weight gain and that she had experienced headaches.[68] Dr. Chen found that Plaintiff's hypertension was "not quite at goal" and changed her prescription dosage.[69] Dr. Chen's notes listed

---

[62]     See id.

[63]     See Tr. 461.

[64]     See id.

[65]     See Tr. 462.

[66]     See id.

[67]     See Tr. 561.

[68]     See Tr. 562.

[69]     See id.

Plaintiff's occupation as "retired."[70]

On September 2, 2011, Plaintiff visited Methodist Hospital following a referral by Dr. Chu for brain imaging.[71]  John Kilpatrick Surratt, M.D., ("Dr. Surratt") observed post-operative changes of clipping degrading the imaging quality.[72]  Dr. Surratt observed that there was no residual or additional aneurysm, although there was mild anatomic variation of Plaintiff's basilar artery.[73]  Dr. Surratt concluded that there was no acute intra-cranial abnormality, although there was some post-treatment changes of suprasellar aneurysm clipping.[74]

On November 2, 2011, Plaintiff returned to Dr. Chen for a follow-up visit.[75]  Dr. Chen noted that Plaintiff's hypertension was in "decent control," and further noted that Plaintiff reported "arm pain."[76]  Dr. Chen's notes indicated there was no edema in Plaintiff's extremities.[77]

On February 1, 2012, Plaintiff returned to Baylor.[78]  Dr. Chen

---

[70]    See id.

[71]    See Tr. 470.

[72]    See id.

[73]    See id.

[74]    See Tr. 471.

[75]    See Tr. 560.

[76]    See id.

[77]    See id.

[78]    See Tr. 557.

10

noted that Plaintiff had been unable to lose weight.[79]  Dr. Chen listed Plaintiff's diagnoses as anemia, hypertension, headaches, arm pain, and back and neck pain.[80]  Dr. Chen stated that she would discuss physical therapy options with Doris H. Kung, D.O., ("Dr. Kung") in regard to Plaintiff's arm pain.[81]

## B.  **Application to Social Security Administration and Post-Application Medical Visits**

Plaintiff protectively applied for disability insurance benefits on February 20, 2012, claiming an inability to work due to a history of brain surgery and associated headaches and memory loss, a history of breast cancer, right arm lymphedema, left arm degenerative pain and arthritis, depression and anxiety, and high blood pressure.[82]  In her application, Plaintiff identified the date of the alleged onset of disability as June 30, 2009.[83]

In a Function Report, Plaintiff described her daily activities.[84]  Plaintiff stated that she lived alone in an apartment.[85]  She indicated that her daily activities included

---

[79]    See id.

[80]    See Tr. 559.

[81]    See id.

[82]    See Tr. 135-37, 139.

[83]    See Tr. 135.

[84]    See Tr. 174-81.

[85]    See Tr. 174.

taking medications, preparing meals, watching television, and reading.[86] Plaintiff stated that her lymphedema made it difficult to put on clothing, get out of a bathtub, or take care of her hair.[87] Plaintiff indicated that she was able to cook sandwiches, frozen dinners, and salads, and was able to do her laundry and light cleaning.[88] Plaintiff indicated that she did not drive, but was able to use public transportation in order to shop for clothing and groceries once per month.[89]

As hobbies and interests, Plaintiff listed reading and watching television.[90] Plaintiff reported talking on the phone with family members and friends daily.[91]

Plaintiff stated that her impairments affected her ability to lift, reach, walk, complete tasks, and use her hands.[92] She reported that she could carry only five pounds and that walking long distances made her arm swell.[93]

Plaintiff reported that she was scared about her health

---

[86]    See Tr. 175.

[87]    See id.

[88]    See Tr. 176.

[89]    See Tr. 177.

[90]    See Tr. 178.

[91]    See id.

[92]    See Tr. 179.

[93]    See id.

deteriorating.[94]   Plaintiff stated that she was forced to wear glasses and use her lymphedema pump daily, and that a bad nerve in her neck caused pain and difficulty sleeping.[95]

Plaintiff visited Dr. Kung on April 5, 2012.[96]   Dr. Kung's physical examination noted lymphedema of Plaintiff's right arm, but found only slight strength loss in Plaintiff's right and left arms due to pain.[97]   Dr. Kung found Plaintiff had full wrist extension, wrist flexon, and was able to conduct finger-to-nose coordination testing.[98]   Dr. Kung noted that Plaintiff suffered from sudden onset headaches, with the most recent headache occurring two months earlier.[99]   Dr. Kung opined that he did not believe the headaches were related to Plaintiff's previous aneurysm or any new neurological issue, due to a lack of other neurological symptoms.[100] Dr. Kung prescribed Vicodin to treat Plaintiff's pain, but advised Plaintiff to limit usage to avoid medication-related headaches.[101]

On April 16, 2012, Sabnam Rehman, M.D., ("Dr. Rehman")

---

[94]    See id.

[95]    See Tr. 180-81.

[96]    See Tr. 552.

[97]    See Tr. 554-5.

[98]    See Tr. 555.

[99]    See id.

[100]   See id.

[101]   See id.

completed a second RFC assessment.[102]  Dr. Rehman's RFC assessment made identical findings to Dr. Rowlands previous findings regarding Plaintiff's limitations.[103]   Dr. Rehman evaluated Plaintiff's headaches, brain cancer, lymphedema, breast cancer, high blood pressure and arthritis.[104]  Dr. Rehman found no loss of motor strength or changes in gait related to Plaintiff's lymphedema or arthritis.[105]  He observed that no residual or additional brain aneurysm was present.[106]  Dr. Rehman noted there were large gaps in the record prior to 2011 and found insufficient evidence to support Plaintiff's claims.[107]

On May 1, 2012, Baylor prepared an imaging report related to a CT scan of Plaintiff's spine.[108]  The report, prepared by Susan Weathers, M.D., ("Dr. Weathers") found evidence of cervical spondyiosis, including fusion of the C2-C3 joints, and decreased density of the thyroid gland.[109]

On August 1, 2012, Plaintiff returned to Baylor and was

---

[102]    See Tr. 592-99.

[103]    See Tr. 592-98.

[104]    See Tr. 599.

[105]    See id.

[106]    See id.

[107]    See id.

[108]    See Tr. 694.

[109]    See Tr. 695.

evaluated by Dr. Chen.[110]   Dr. Chen communicated Dr. Weathers'
findings to Plaintiff, and reviewed Plaintiff's physical, family,
and social history.[111]  Dr. Chen noted that Plaintiff complained of
increased anxiety and prescribed Xanax.[112]  Dr. Chen listed anxiety
and  thyroid  disorder  as  Plaintiff's  diagnoses.[113]    Plaintiff
received follow-up imaging on her thyroid on August 3, 2012.[114]
Imaging revealed a zero-point-nine centimeter nodule in Plaintiff's
right thyroid lobe.[115]

On November 12, 2012, Plaintiff returned to Baylor, where she
was evaluated by Louise Stuart, M.D. ("Dr. Stuart").[116]  Dr. Stuart
noted that Plaintiff felt "well," although she did complain of
fatigue, skin spots, and weight gain over the previous three
years.[117]  Dr. Stuart observed in her physical exam that Plaintiff's
right arm had edema into the hand, and that her left arm was
normal.[118]  Dr. Stuart noted that Plaintiff's thyroid nodule was too
small  to  biopsy,  and  exhibited  no  worrisome  features  on  an

---

[110]   See Tr. 691.

[111]   See id.

[112]   See id.

[113]   See id.

[114]   See Tr. 689.

[115]   See Tr. 690.

[116]   See Tr. 688.

[117]   See id.

[118]   See id.

ultrasound taken that day.[119]

On January 3, 2013, Plaintiff returned to Baylor for a follow-up appointment where she was evaluated by Dr. Chen.[120]  Plaintiff complained of lymphedema in her right arm, right ear pain, and a chest cold possibly aggravated by mold.[121]  Dr. Chen's examination found no joint pain or swelling and no muscle pain.[122]  Further, Plaintiff reported she did not suffer from lightheadedness, vertigo, or headaches.[123]  Dr. Chen's diagnoses found that Plaintiff suffered from benign hypertension, neck pain, and a vitamin D deficiency.[124]

On February 13, 2013, Plaintiff visited the Lymphedema and Wound Care Institute.[125]  In an assessment form, Plaintiff rated her pain as a ten on a ten-point scale.[126]  The report indicated that Plaintiff's lymphedema was in her right upper arm, was graded stage II, and did not affect Plaintiff's skin.[127]  The report stated that Plaintiff was able to tolerate compression without pain, and that

---

[119]    See id.

[120]    See Tr. 680.

[121]    See id.

[122]    See id.

[123]    See id.

[124]    See Tr. 680-81.

[125]    See Tr. 673.

[126]    See id.

[127]    See id.

no post-treatment compression was used.[128]   In a treatment plan and goals report prepared by the Institute, Plaintiff was prescribed lymphedema therapy, including drainage and compression, five times per week for one-to-three weeks, followed by therapy three-to-five times per week as volume reduction was achieved.[129]

Defendant denied Plaintiff's application at the initial and reconsideration levels.[130]   Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[131]   The ALJ granted Plaintiff's request and conducted a hearing on March 12, 2013.[132]

## C.  **Hearing**

Plaintiff and a vocational expert ("VE"), testified at the hearing.[133]   Plaintiff was represented by an attorney.[134]

Plaintiff's attorney testified that Plaintiff's claim for disability related to right arm lymphedema that required her to wear a compression sleeve.[135]   Her attorney argued that swelling

---

[128]     See id.

[129]     See Tr. 676.

[130]     See Tr. 70-74, 76-79.

[131]     See Tr. 80-81.

[132]     See Tr. 27-64, 90-113.

[133]     See Tr. 29-64.

[134]     See Tr. 29.

[135]     See Tr. 32-33.

17

limited Plaintiff's ability to handle, finger, and feel.[136]

The ALJ asked Plaintiff questions about her age and educational background.[137]  Plaintiff testified that was fifty-nine years old at the time of the hearing.[138]  Plaintiff confirmed that she had graduated from high school and that she had stopped working in June 2009.[139]  Plaintiff testified that she worked as an EKG technician for thirty-six years prior to June 2009.[140]

The ALJ then asked the VE about Plaintiff's employment history.[141]  The VE opined that Plaintiff's employment as an EKG technician was light, semi-skilled work.[142]

Plaintiff testified that she quit working in June 2009 and had not worked since.[143]  Plaintiff testified that she originally had breast cancer in the 1990's, but was able to return to work.[144]  She stated that she had attended physical therapy, but that her employer would not allow her to wear a compression bandage.[145]

---

[136]   See Tr. 33.

[137]   See Tr. 34.

[138]   See id.

[139]   See id.

[140]   See id.

[141]   See Tr. 35.

[142]   See id.

[143]   See Tr. 36.

[144]   See Tr. 37.

[145]   See Tr. 37-38.

Plaintiff stated that her right arm lymphedema was the primary reason she stopped working in 2009.[146]  Plaintiff testified that she has continued to go to therapy to treat her right arm lymphedema.[147]

The ALJ stated that previous medical findings showed little extremity limitations and asked Plaintiff's attorney what doctors may have missed.[148]  Plaintiff's attorney stated that the doctors found that Plaintiff was able to work as long as she wore the compression sleeve.[149]  Plaintiff's attorney opined that there was a "good cause" issue and that he did not agree with previous medical rulings.[150]

Plaintiff stated that she wore a compression sleeve whenever her arm swelled.[151]  She reported that her arm did not swell as much since she stopped working, but that her use of the arm was always affected.[152]  Plaintiff stated that her arm was very tight after using the compression bandage, and that there was no treatment for her condition.[153]

When asked about her depression, Plaintiff said she became

---

[146]     See Tr. 38.

[147]     See Tr. 39.

[148]     See id.

[149]     See Tr. 40.

[150]     See id.

[151]     See Tr. 41.

[152]     See id.

[153]     See Tr. 43.

"kind of upset" when she had to wear her compression sleeve.[154] Plaintiff stated that she underwent brain surgery in 1998, but that she was able to return to work.[155] Plaintiff indicated that she occasionally struggled with her speech, but stated that she had no difficulty functioning after she returned to work.[156] Plaintiff indicated that she had normal memory loss for a woman her age.[157]

Plaintiff testified that her left arm and shoulder had been a problem since May 2012.[158] Plaintiff testified that doctors told her there was an issue with her neck causing her shoulder pain, and that prescribed pain medication was not effective.[159] Plaintiff stated that she asked for a pain patch but was instead given physical therapy.[160]

Plaintiff testified that she lived alone and was self-sufficient, although she had recently become unable to lift pots in order to prepare meals.[161]

Plaintiff testified that her increased pain led her to visit

---

[154]    See Tr. 44.

[155]    See id.

[156]    See Tr. 45.

[157]    See id.

[158]    See Tr. 46.

[159]    See id.

[160]    See id.

[161]    See Tr. 48.

the Lymphedema Wound Care Clinic beginning in January 2013.[162]

Plaintiff testified that there were records indicating she was not wearing her sleeve as prescribed because she was given a compression sleeve that did not fit in 2009.[163]  Plaintiff stated that her job required reaching down, which increased the swelling in her arm.[164]  Plaintiff testified that following an incident when she pushed on a door, she experienced pain in her arm related to swelling for the first time.[165]

Plaintiff stated that she was unable to complete therapy while working, and that, while she told a supervisor that she could lift forty pounds in connection with helping patients, she was actually physically unable to lift forty pounds.[166]

The VE testified that occasionally helping people on and off examination tables was a normal part of an EKG technician's job description.[167]

Plaintiff testified that swelling would cause fluid to leak to her back, necessitating her therapy.[168]  Plaintiff testified that

---

[162]    See Tr. 50.

[163]    See Tr. 51.

[164]    See Tr. 53.

[165]    See id.

[166]    See 53-54.

[167]    See Tr. 54-55.

[168]    See Tr. 55.

this swelling affected her fingers and hands as well as her arm.[169]

Plaintiff testified that her arm swelling caused her to miss work to the point that she was told she could no longer do her job.[170]  Plaintiff testified that she was unable to work due to her arm lymphedema, not mental issues or issues resulting from her brain surgery.[171]

The ALJ then asked the VE several questions about a hypothetical individual of Plaintiff's age and skill level.[172]  The VE opined that such an individual could do light, semi-skilled work with only occasional climbing of ladders, ropes, or scaffolds, occasional crawling, frequent, not continuous reaching and handling and occasional exposure to vibration.[173]  The VE opined that such an individual could work as an EKG technician if the individual could frequently reach and handle, but not if they were limited to only occasional reaching and handling.[174]  The VE explained that work as an EKG technician required frequent reaching, handling, and fingering.[175]  The VE opined that Plaintiff did not have transferable skills at either the same level of exertion or at the

---

[169]    See id.

[170]    See Tr. 56.

[171]    See Tr. 57.

[172]    See id.

[173]    See id.

[174]    See Tr. 58.

[175]    See id.

sedentary level.[176]

Plaintiff testified that she wore a wig because she was unable to take care of her hair.[177]  She stated that she had been taught to treat the swelling in her arm with a pump, and that she could use it herself.[178]

## D.  <u>Commissioner's Decision</u>

On July 3, 2013, the ALJ issued an unfavorable decision.[179] The ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that her right arm lymphedema was severe.[180]  The ALJ found Plaintiff's high blood pressure, post-brain aneurysm, headaches, hyperlipedemia, anemia, vitamin D deficiency, status post-breast cancer, lumbar spine degenerative disc disease, cervical spine degenerative disc and joint disease, left shoulder degenerative joint disease, thyroid nodule, anxiety, and depression were all non-severe.[181]  The ALJ noted that Plaintiff's high blood pressure and hyperlipidemia were controlled by medication and did not cause organ damage or other

---

[176]    <u>See</u> Tr. 58-59.

[177]    <u>See</u> Tr. 61.

[178]    <u>See</u> Tr. 62.

[179]    <u>See</u> Tr. 9-19.

[180]    <u>See</u> Tr. 14.

[181]    <u>See</u> <u>id.</u>

complications.[182]   He found that her headaches had not caused any neurological deficits or limitations, and that a scan of Plaintiff's brain in September 2011 showed no after-effects from her aneurysm post-surgery.[183]   The ALJ noted that there was no evidence of recurrence of metastasization of Plaintiff's breast cancer.[184]   The ALJ observed that while there was evidence of degenerative disc and joint disease, both were mild according to medical evidence and had no impact on Plaintiff's ability to function.[185]   He found that Plaintiff's thyroid nodule, vitamin D deficiency and anemia had been treated with medications and had no effect on Plaintiff's ability to function.[186]

The ALJ found Plaintiff's mental impairments to be non-severe, both singularly and in combination, as they caused minimal limitations on Plaintiff's ability to perform basic activities.[187] The ALJ noted that while Plaintiff's primary care providers observed signs of depression and anxiety, Plaintiff never received psychiatric care and there was no evidence of impairment.[188]   The ALJ found that Plaintiff had no limitations in the activities of

---

[182]   See id.

[183]   See id.

[184]   See id.

[185]   See Tr. 14-15.

[186]   See Tr. 15.

[187]   See id.

[188]   See id.

social functioning, concentration, persistence, or pace and had never experienced any episodes of decompensation of extended duration.[189]

The ALJ found that while Plaintiff's right arm lymphedema was severe, it did not meet or medically equal any of the listings of the impairments in the regulations[190] (the "Listings").[191]   The ALJ noted that while there was some functional impact, Plaintiff had not lost major function of her right arm and had not remained under surgical management.[192]

After finding that none of Plaintiff's impairments met or equaled a Listing, the ALJ continued in his analysis to find that Plaintiff had the functional capacity to perform light work with several additional restrictions, including occasionally crawling, frequently reaching and handling with her right arm, and with limited exposure to vibration.[193]   The ALJ stated that while the underlying impairments could reasonably be expected to produce Plaintiff's pain and other symptoms, that Plaintiff's statements concerning the intensity, persistence and effects of her symptoms

---

[189]    See id.

[190]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[191]    See Tr. 15–16.

[192]    See Tr. 16.

[193]    See id.

were not entirely credible.[194]

The ALJ cited hospital notes from June 18, 2009, where Plaintiff rated her pain as a two on a ten-point scale and was diagnosed with mild lymphedema.[195]  Plaintiff admitted during that visit that she did not wear a compression sleeve as prescribed.[196]

The ALJ also cited an October 9, 2009 report that showed no muscle weakness or atrophy, where Plaintiff was able to demonstrate normal reaching, handling, and fingering in each hand.[197]  While Plaintiff did have slight swelling, there was no evidence of skin changes typical of severe lymphedema.[198]

The ALJ cited to numerous doctor visits through 2009 to 2011 where Plaintiff did not complain of lymphedema.[199]  The ALJ specifically relied on a June 2011 examination where Plaintiff complained of hypertension, hyperlipidemia, joint pain, and anemia, but made no mention of lymphedema.[200]  In a similar incident on April 5, 2012, Plaintiff complained of headache and neck pain, and while a physical examination did reveal lymphedema, only minor

---

[194]    See id.

[195]    See Tr. 16-17.

[196]    See Tr. 17.

[197]    See id.

[198]    See id.

[199]    See id.

[200]    See id.

functional limitation was observed.[201]   In August 2012, Plaintiff did not complain of arm pain and no pain or swelling was noted on her physical examination.[202]

The ALJ noted that in November 2012, Plaintiff did not complain of arm pain, but a physical examination revealed edema of her right arm.[203]   A progress note in January 2013 indicated that Plaintiff complained of right arm lymphedema, but that her physical examination was normal.[204]

The ALJ noted that in February 2013, Plaintiff visited a doctor specifically for her lymphedema for the first time since 2009.[205]   At that meeting, Plaintiff indicated she had been using a compression sleeve and that she had a compression pump, but did not use it due to pain.[206]   Plaintiff's examination revealed a non-pitting edema with pain.[207]   Plaintiff was scheduled for three weeks of lymphedema treatment to drain excess fluid.[208]

The ALJ noted that medical consultants opined that Plaintiff

---

[201]    See id.

[202]    See id.

[203]    See id.

[204]    See id.

[205]    See id.

[206]    See id.

[207]    See id.

[208]    See id.

could perform light work.[209]    The ALJ found these analyses consistent with the record and assigned them significant weight.[210]

The ALJ also considered a statement from November 3, 2009, by Dr. Blick, Plaintiff's treating medical source, opining that Plaintiff was unable to return to work due to severe right arm lymphedema.[211]   The ALJ found that the doctor's statement was not well-supported by the longitudinal medical record, as Plaintiff went several years without either receiving treatment for or complaining of arm lymphedema or accompanying functional limitations.[212]   The ALJ accordingly assigned little weight to Dr. Blick's opinion.[213]

The ALJ noted that Plaintiff suffered from right arm lymphedema during the period in question, but found that treatment must have been largely effective based on Plaintiff's infrequent complaints.[214]   The ALJ also considered that Plaintiff's injuries appeared to be somewhat related to non-compliance with treatment.[215]

Relying on the vocational expert's testimony that a hypothetical individual with Plaintiff's RFC limitations would be

---

[209]    See Tr. 18.

[210]    See id.

[211]    See id.

[212]    See id.

[213]    See id.

[214]    See id.

[215]    See id.

able to perform her past work as an EKG technician, the ALJ found Plaintiff not to be disabled from June 9, 2009, through the date of the hearing.[216]

Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[217] Plaintiff then timely sought judicial review of the ALJ's decision by this court.

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  <u>Legal Standard</u>

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period

---

[216]    <u>See</u> <u>id.</u>

[217]    <u>See</u> Tr. 1-3, 80-81.

of not less than twelve months."   42 U.S.C. § 423(d)(1)(a); <u>see</u> <u>also</u> <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994).   The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

<u>Bowling v. Shalala</u>, 36 F.3d 431, 435 (5th Cir. 1994); <u>see also</u> 20 C.F.R. §§ 404.1520, 416.920.   By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth.   <u>Crowley v. Apfel</u>, 197 F.3d 194, 198 (5th Cir. 1999).   If the Commissioner satisfies her step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.   <u>Muse v.</u>

Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not re-weigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

31

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Defendant argues that the decision is legally sound and is supported by substantial evidence.

Plaintiff asserts that the ALJ's decision contains the following errors:

1. The ALJ erred in finding the combined effects of [P]laintiff's status post brain [a]neurysm and surgery; headaches; status post breast cancer; lumbar degenerative disc disease; depression; anxiety; memory loss and high blood pressure not to be "severe."

. . . .

2(a)  The ALJ erred in failing to incorporate consideration of all [P]laintiff's residual function capacity.

2(b) The ALJ erred by improperly relying on the response of the vocational expert to a hypothetical question which was incomplete, because it failed to reflect all of [P]laintiff's medically determinable impairments.

. . . .

3(a) The ALJ violated Social Security Ruling [("SSR")] 96-6p and erred in not obtaining an updated medical expert opinion concerning the issue of medical equivalence.

3(b) The ALJ's failure to obtain an updated medical expert opinion constitutes the ALJ's failure properly to develop the case.

. . . .

4(a) The ALJ erred in failing to obtain an updated medical opinion of a medical expert as to the medical equivalency of [P]laintiff's combined physical and mental impairments.

4(b) The ALJ erred in failing to consult a medical expert

32

regarding [P]laintiff's RFC in light of [P]laintiff's combined physical and mental impairments.

. . . .

5(a) The ALJ erred in failing to consult a medical expert to determine [P]laintiff's mental RFC.

5(b) The ALJ's RFC fails properly to reflect [P]laintiff's mental limitations.

5(c) ALJ erred in relying on VE testimony in response to a hypothetical question based on an RFC which failed to reflect [P]laintiff's mental limitations.

. . . .

6. The ALJ failed to order a consultative examination, and thus erred in failing properly (*sic*) to develop the case.

. . . .

7. The ALJ erred in failing to consider the non-exertional impairment of pain and its effects on the [P]laintiff's ability.

. . . .

8. The ALJ erred in failing to conduct a meaningful evaluation of [P]laintiff's credibility.

. . . .

9. The ALJ failed to properly consider the side effects from the [P]laintiff's multiple medications on [P]laintiff's ability to work, as required by SSR 96-7p and SSR 96-8p.

. . . .

10. The ALJ wholly failed to acknowledge certain evidence favorable to [P]laintiff.[218]

The court considers Plaintiff's arguments in turn.

---

[218]   Doc. 9, Pl.'s Mot. for Summ J. pp. 4-12.

## A.  <u>Severity of Plaintiff's Other Ailments</u>

Plaintiff argues that the ALJ erred by finding her status post-brain aneurysm and surgery, headaches, status post-breast cancer, lumber degenerative disease, cervical degenerative disc disease, left shoulder degenerative joint disease, depression, memory loss, and high blood pressure to be "not severe." Plaintiff argues that an impairment is found not to be severe "only if it is a slight abnormality having such minimal effect on an individual that it would not be expected to interfere with the individual's ability to work." <u>Loza v. Apfel</u>, 219 F.3d 378, 392 (5th Cir. 2000). Plaintiff argues that the ALJ's finding defies "both common sense and the clear evidence of record."[219]

Defendant responds that Plaintiff has not cited to any evidence of functional limitation created by Plaintiff's non-severe impairments.

At step two of the disability analysis, the ALJ must determine whether the alleged impairments are severe or not severe. <u>See</u> 20 C.F.R. § 404.1520(a)(4)(ii), (c); 20 C.F.R. § 416.920(a)(4)(ii), (c). A severe impairment is one that significantly limits an individual's ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). Basic work activities are those abilities and aptitudes required for most jobs, including, inter alia, walking, sitting, seeing, hearing, and

---

[219]    <u>Id.</u> p. 4.

34

understanding and carrying out simple instructions.  20 C.F.R. §§ 404.1521(b), 416.921(b).

The Fifth Circuit instructs that an impairment is not severe if it is a "slight abnormality" that has such a "minimal effect on the individual that it would not be expected to interfere with an individual's ability to work, irrespective of age, education or work experience."  Herrera v. Comm'r of Soc. Sec., 406 Fed. App'x 899, 902 n.1 (5th Cir. 2010)(unpublished)(quoting Loza, 219 F.3d at 391).

Here, the ALJ considered the impairments imposed by ailments other than Plaintiff's right arm lymphedema and found that they did not create any functional limitations on Plaintiff's ability to perform basic work activities.  Plaintiff's past surgeries were successful, and Plaintiff's anemia, thyroid nodule, and headaches were treated with medication.  Plaintiff does not argue that her shoulder or spine degenerative disease affected her ability to sit, stand, or complete any other basic work activity.

The ALJ similarly found no evidence of mental impairments.  At the hearing, Plaintiff denied memory loss, and stated that she was only depressed when wearing her compression sleeve.[220]  Plaintiff specifically stated her lymphedema was her primary impairment, and when asked if she was able to function mentally, Plaintiff

---

[220]    See Tr. 44.

responded, "Oh yeah."[221]  When asked later at the hearing if mental issues contributed to her inability to work, Plaintiff stated that her impairment was "definitely not mental."[222]  The ALJ noted that beyond notes from primary care physicians spread over several years, there was no evidence that Plaintiff ever sought any psychological treatment, and there was no evidence that Plaintiff's anxiety or depression affected any basic work activities.

There is substantial evidence supporting the ALJ's decision that Plaintiff's other symptoms were not severe impairments. Plaintiff focuses on the number of ailments alleged, but does not point to any record evidence establishing that Plaintiff's conditions affected her ability to conduct basic work activities.

Moreover, even if the ALJ had erred at step two in his determination, such an error was harmless.  An error is harmless if it does not "affect the substantial rights of a party," Taylor v. Astrue, 706 F.3d 600, 603 (5th Cir. 2012), or when it "is inconceivable that the ALJ would have reached a different conclusion" absent the error.  Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003).  Here, the ALJ progressed beyond step two in determining that Plaintiff was not disabled.  Because the ALJ progressed beyond step two and considered all limitations supported by the record, even if there was error at step two, such error was

---

[221]   Tr. 45.

[222]   Tr. 57.

36

harmless.  Id. at *8; Garcia v. Astrue, No. M-08-264, 2012 WL 13716 (S.D. Tex. 2012) (unpublished).

Additionally, because the ALJ found that Plaintiff's right lymphedema was severe, and continued beyond step two in his evaluation, the ALJ's decision on this issue is not reversible by this court.

## B.   VE's Hypothetical Question

Plaintiff argues that the ALJ erred by relying on the VE's response to a hypothetical question that was incomplete, because it did not reflect all of Plaintiff's impairments, and because it did not reflect Plaintiff's mental impairments.

The ALJ is not required to incorporate limitations that the ALJ did not find supported in the record.  See Bowling, 36 F.3d at 436; Morris v. Bowen, 865 F.2d 333, 336 (5th Cir. 1988).  Because the ALJ did incorporate Plaintiff's lymphedema, the only condition he found to be severe, into his hypothetical question, his hypothetical was not defective.  Further, Plaintiff was represented by counsel and had the opportunity to pose her own hypothetical question, but chose not to.  See Carey, 230 F.3d at 146-47 (holding that plaintiffs could not scan the record for conflicts when "the conflict was not deemed sufficient to merit adversarial development in the administrative hearing").  The court finds that the ALJ did not improperly rely on the VE's answers to the ALJ's hypothetical questions.

## C. __Medical Expert__

Plaintiff makes several arguments regarding the ALJ's failure to utilize a medical expert.  Plaintiff complains that the ALJ improperly interpreted raw medical data, that the ALJ did not obtain updated medical expert opinions on severity, equivalency, and RFC, and that the ALJ failed to develop the case by not ordering a consultative examination.

Defendant responds that the ALJ properly developed the record, and that the single consultative examination, along with medical records and hearing testimony, acts as substantial evidence in support of the ALJ's decision.  Defendant further argues that the ALJ met his duty to develop the record and that Plaintiff bears the burden of proving disability.

### 1.  Raw Data

Plaintiff argues that the ALJ interpreted the raw medical data on his own instead of properly relying on an expert medical opinion in making his disability determination.  Plaintiff cites to two cases that support the proposition that an ALJ, as a layperson, should not interpret raw medical data in determining a claimant's RFC.  See Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003); Manso-Pizzaro v. Sec'y of Health & Human Serv., 76 F.3d 15, 17-19 (1st Cir. 1996).

In Frank, the Fifth Circuit found that an ALJ could not make his own medical conclusions regarding whether certain impairments

would cause signs of atrophy or muscle tone loss. Frank, 326 F.3d at 622. The court in Manso-Pizzaro noted that "given the illegibility of non-trivial parts of the medical reports, coupled with identifiable diagnoses and symptoms that seem to indicate more than mild impairment, we believe the record alerted the ALJ to the need for expert guidance regarding the extent of the claimant's residual functional capacity to perform her particular past employment." Manso-Pizzaro, 76 F.3d at 19.

The court agrees that an ALJ should not take on the physician's role and draw conclusions from the medical data; however, there is no evidence that the ALJ did so in this case. Plaintiff cites to no specific instance where the ALJ overstepped his bounds as a layperson. The medical record in this case is clear and contains sufficient treating, examining, and consulting medical providers' interpretations of the raw medical data from which the ALJ could determine Plaintiff's RFC. The ALJ specifically cited to medical opinions finding that Plaintiff had mild swelling in her right arm, and noted a gap of several years where Plaintiff apparently did not seek treatment for her arm. Similarly, the ALJ relied on the findings of doctors that found Plaintiff's thyroid nodule and hypertension to be benign and her headaches to be unrelated to her previous aneurysm, not the raw data itself.

**2.  Updated Opinion**

Relatedly, Plaintiff further contends that the ALJ should have consulted a medical expert for an updated opinion. Plaintiff argues that the court has a non-discretionary duty to obtain an updated medical opinion regarding the cumulative effects of a claimant's impairments; however, numerous courts have held that the Soscial Security regulations do not create such a duty. See Ybarra v. Colvin, Civil Action No. H-13-3720, 2015 WL 222330 *7 fn. 5 (S.D. Tex. 2015) (finding that Plaintiff's attorney had made substantially similar but unsuccessful arguments on at least seven prior occasions). The regulations do not mandate that the ALJ ask for and consider opinions from medical experts. See 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii); Haywood v. Sullivan, 888 F.2d 1463, 1467-68 (5th Cir. 1989) (holding that "(a)n ALJ requests a [medical expert] to testify when she or he feels it necessary"). Decisions regarding whether a claimant meets or equals a Listing and a claimant's RFC are ultimately reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Soc. Sec. Ruling 96-5p, 1996 WL 374183, at **2-3, 5 (S.S.A. 1996); Soc. Sec. Ruling 96-6p, 1996 WL 374180, at **3-4.

Substantial evidence supports the ALJ's finding at step three when the plaintiff fails to demonstrate the presence of specified medical criteria. Cf. Selders, 914 F.2d at 619 ("The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination"). When an ALJ finds the

40

impairments are not equivalent in severity to any Listing, the disability determination form satisfies the requirement to receive expert opinion evidence into the record.  <u>See</u> Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3.  If an ALJ receives additional medical evidence that may change previous expert findings or decides that the symptoms, signs, and laboratory findings reasonably suggest medical equivalence, then the ALJ must obtain an updated medical opinion.  <u>Id.</u> at **3-4.

Plaintiff relies on <u>Brister v. Apfel</u>, 993 F. Supp. 574, 577 n.2 (S.D. Tex. 1998), where the district court rejected an argument similar to the one made by Plaintiff here, noting that the decision whether additional medical evidence requires an updated medical opinion is within the discretion of the ALJ.  Similarly, an ALJ may ask for the opinion of a medical expert at a hearing, but this is not mandatory.  <u>Madis v. Massanari</u>, Civil Action No. 01-50430, 2001 WL 1485699, at *1 (5th Cir. Nov. 5, 2001)(unpublished); <u>see also</u> 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii).

Here, there was substantial evidence supporting the ALJ's decision in the absence of a testifying medical expert.  In addition to two physical RFC's that found that Plaintiff was not disabled, medical records spread over a forty-five-month period supported the ALJ's findings that Plaintiff's ailments, individually or in combination, did not meet or medically equal a Listing.  Plaintiff does not argue that the ALJ ignored post-

hearing evidence that may have altered the substantial evidence of record, nor did the ALJ find the evidence suggested medical equivalence.  In light of the foregoing, the court finds that the ALJ, having properly relied on and weighed the medical opinions in the complete record before him, acted within his discretion and based his decision on substantial record evidence.

### 3.  Record Development

Plaintiff contends that the ALJ's failure to consult a medical expert for an updated opinion constituted a failure to develop the case.  The Fifth Circuit imposes a duty on the ALJ to fully and fairly develop the facts relating to Plaintiff's claim for disability benefits.  Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000).  However, reversal of the ALJ's determination is appropriate only if Plaintiff can show prejudice from the ALJ's failure to request additional evidence.  Id.  Prejudice can be established by "showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision."  Id. (quoting Ripley v. Chater, 67 F.3d 552, 577 n.22 (5th Cir. 1995)).

As explained above, the ALJ in this case was not required to obtain an opinion from a medical expert, and the ALJ's decision not to do so is supported by substantial evidence.  Thus, the ALJ did not err in failing to develop the case.  Moreover, even if the ALJ should have obtained an opinion from a medical expert or requested

a consultative examination, Plaintiff points to no additional evidence that would have been adduced that could have changed the result.  Therefore, Plaintiff has failed in her burden of showing that she was prejudiced by the ALJ's failure to consult a medical expert.

### D.  <u>Non-Exertional Impairment of Pain</u>

Plaintiff claims the ALJ erred by failing to consider the non-exertional impairment of pain and the effect of pain on her ability to work.  Despite Plaintiff's claims, the ALJ addressed both the effects and extent of her pain in determining her RFC.

Where subjective complaints are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the entire case record.  <u>Eovaldi v. Astrue</u>, 729 F. Supp. 2d 848, 863 (S.D. Tex. 2010).  The ALJ has discretion to determine a claimant's credibility.  <u>See</u> <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001).  When the ALJ's evaluation of a claimant's subjective complaints is supported by substantial evidence, the Court will defer to the ALJ's assessments.  <u>Eovaldi</u>, 729 F. Supp. 2d at 864.  Here, the ALJ found that Plaintiff's impairments could "reasonably be expected to cause the alleged symptoms," however, he deemed her statements concerning the intensity, persistence, and limiting effects of these symptoms "not entirely credible" to the extent they were inconsistent with the

record as a whole and RFC assessments in particular.[223]

Plaintiff's statements regarding the subjective pain she experienced at the ALJ hearing conflicted with numerous records over the preceding four years. Plaintiff testified that pain in her right arm caused by lymphedema was the primary reason she stopped working June 2009.[224] However, the ALJ cited to progress notes from Memorial Hermann in June 2009 where Plaintiff rated her pain as a two on a ten-point scale, and was found to have mild lymphedema.[225] Additionally, the ALJ noted that Plaintiff apparently received no treatment, and did not even list lymphedema as a symptom during numerous doctor visits in 2010 and 2011.[226] The ALJ observed that after treatment in 2009, Plaintiff did not specifically seek treatment for pain relating to lymphedema until February of 2013.[227]

Accordingly, the record contains substantial evidence to support the ALJ's determination that the ALJ properly considered the effect of Plaintiff's pain when determining her RFC.

**E.   Plaintiff's Credibility**

Plaintiff argues that the ALJ provided only a recital

---

[223]   See Tr. 16.

[224]   See Tr. 37-38.

[225]   See Tr. 16-17.

[226]   See Tr. 17.

[227]   See id.

regarding Plaintiff's credibility, unrelated to any specific findings by the ALJ or evidence cited from the record.

As discussed above, the ALJ did in fact cite significant medical evidence that specifically contradicted Plaintiff's testimony at the hearing. The ALJ is clearly permitted to reject Plaintiff's complaints if he finds they lack credibility, and instead rely on medical sources that support his findings. Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994). Here, the ALJ has satisfied his burden to explain his reasons for assigning less than full weight to Plaintiff's testimony, and has supported his findings with substantial evidence.

## F. Medication Side Effects

Plaintiff argues the ALJ erred by failing to consider the side effects of Plaintiff's medication in his analysis.

The regulations state that any side effects of medication should be considered when reaching a decision on a claimant's ability to work. 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv); see also Loza, 291 F.3d at 396-97. Here, Plaintiff is correct that the ALJ does not specifically mention the effect of Plaintiff's medications in his determination. However, Plaintiff does not point to any evidence in her medical record to support the contention that she actually experienced side effects from her medication, much less that the side effects affected her ability to work.

45

The record shows that Plaintiff never complained of medication side effects to any healthcare provider or at the hearing, although she did list dizziness, nausea and vomiting on her disability form. However, even if the ALJ erred by not addressing Plaintiff's alleged side effects, such error is harmless if it is inconceivable that a different decision would have been reached if the effects of Plaintiff's side effects had been discussed by the ALJ. See, e.g. Rasmussen v. Astrue, 254 Fed. App'x 542, 547 (7th Cir. 2007) (holding that an ALJ's failure to discuss side effects constituted harmless error).  Here, Plaintiff's disability form presents the only evidence that Plaintiff experienced side effects.  There is no evidence in the record that these or other side effects affected Plaintiff's ability to work, so to the extent that the ALJ erred by not addressing the effects of Plaintiff's medication, such error was harmless.

G.  **Failure to Acknowledge Favorable Evidence**

In her final point of error, Plaintiff argues that the ALJ had evidence favorable to Plaintiff but failed to acknowledge such evidence.  Specifically, Plaintiff argues that the ALJ should have given deference to records including expert assessments of Plaintiff's RFC which showed that Plaintiff should have been limited to light work with only occasional use of her arm, and to Plaintiff's explanations of non-compliance, and that the ALJ implicitly relied on consultative examinations controverting

treating physician evaluations.

Plaintiff argues that the ALJ erred by ignoring evidence that Plaintiff was limited to light work with only occasional use of her arm.  In support of this proposition, Plaintiff cites to Plaintiff's treatment records taken from the Lymphedema Wound Care Clinic and a letter of medical necessity.  Neither of these documents assess Plaintiff's RFC either implicitly or explicitly. The ALJ considered multiple sources and thus had substantial evidence in support of his finding that Plaintiff could engage in work at the light exertion level.  Furthermore, even if Plaintiff could establish that the ALJ was incorrect in his assessment of Plaintiff's RFC, Plaintiff has not argued that the ALJ erred in determining that Plaintiff's lymphedema did not meet a Listing, so Plaintiff cannot show that she was prejudiced by the ALJ's determination.  See Brock, 84 F.3d at 728 (holding that a plaintiff must show he "could and would have adduced evidence that might have altered the result" to establish prejudice).

Plaintiff argues that the ALJ unfairly characterizes Plaintiff's noncompliance in treatment of her lymphedema. Specifically, the ALJ stated that "when there have been issues with [Plaintiff's lymphedema], they appear to be somewhat related to her non-compliance with compression treatment."[228]  The ALJ mentions two instances where noncompliance is mentioned in the record, one in

___

[228]    Tr. 18.

June 2009 and one in February 2013, where Plaintiff admitted to not following treatment plans regarding her lymphedema.[229] Plaintiff argues that the ALJ ignores that Plaintiff was given a compression sleeve that did not fit and was financially unable to purchase a corrected sleeve.

Under the SSR:

[a]n individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the [SSA] determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability.

Soc. Sec. Ruling 82-59, 1982 WL 31384, at *1, 5 (S.S.A. 1982). The Fifth Circuit has held that while a condition that can be remedied is not disabling, a person who is unable to afford such treatment may still be found disabled. See <u>Lovelace v. Bowen</u>, 813 F.2d 55, 59 (5th Cir 1986).

However, in this case the ALJ did not find that Plaintiff was disabled in the absence of treatment. The ALJ found that while Plaintiff's impairment was severe, her impairment did not meet or medically equal a Listing. Rather than relying on non-compliance as the basis of his finding, the ALJ cited Plaintiff's non-compliance only as it related to Plaintiff's credibility. See

---

[229] <u>See</u> Tr. 17.

Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990) (holding that the ALJ properly considered claimant's failure to take medication as grounds that complaints lacked credibility).

Plaintiff argues for the first time that she was financially unable to replace her compression sleeve. At the ALJ hearing, Plaintiff states only that the sleeve "didn't fit" and that "they wouldn't take it back."[230] The record indicates that Plaintiff was prescribed with a new compression sleeve seven days after her first treatment at Memorial Hermann in June 2009.[231] Nowhere in the record or at the hearing did Plaintiff indicate that she was unable to afford the newly prescribed sleeve.

Plaintiff appears to be thus arguing that the ALJ should have considered evidence not included in the record. While the ALJ has a duty to fully and fairly develop the record, Plaintiff bears the ultimate burden of proving she is disabled within the meaning of the Act. Compare Carey, 230 F.3d at 142, with Wren, 925 F.2d at 125. Plaintiff was represented by counsel and had the opportunity to explain her noncompliance, and did in fact offer an explanation. However, the ALJ's finding that Plaintiff's explanation was not entirely credible is supported by substantial evidence.

Plaintiff also argues that the ALJ "implicitly" relied on non-treating examinations that controverted treating physician

---

[230]   Tr. 51.

[231]   See Tr. 256.

evaluations without specifically citing to any specific evaluation within the ALJ's decision.  The court finds no evidence that non-treating examinations controverted the findings of treating physicians, or that the ALJ in fact relied on such findings.

Having considered all of Plaintiff's claims, the court finds that Plaintiff's motion for summary judgment is **DENIED**.

## H.   Defendant's Motion for Summary Judgment

Defendant asserts in her motion that the ALJ's decision should be affirmed because the ALJ properly determined that Plaintiff was never under a disability during the period in question.

The court recognizes the seriousness of Plaintiff's medical conditions.  However, the court must review the record with an eye toward determining only whether the ALJ's decision is supported by more than a scintilla of evidence.  See Carey, 230 F.3d at 135. Here, the court finds more than a scintilla of evidence in support of the ALJ's decision.  Therefore, the court cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes.  See Chambliss, 269 F.3d at 522; Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991).

For the reasons stated above, the court finds that the Commissioner has satisfied her burden.  As a result, the ALJ's decision finding Plaintiff to be not disabled is supported by substantial record evidence and Defendant's Motion for Summary Judgment is **GRANTED**.

50

### IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Cross-Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this <u>16</u><sup>th</sup> day of March, 2015.


_____
U.S. MAGISTRATE JUDGE

51